UNITED STATES *v.* N. S. MEYER, INC. (No. 3311)[1]

United States Court of Customs and Patent Appeals, November 10, 1930

*Charles D. Lawrence*, Assistant Attorney General (*William H. Futrell*, special attorney, of counsel), for the United States.

*Brooks & Brooks* (*Ernest F. A. Place* of counsel) for appellee.

[1] T. D. 44381.

202

[Oral argument October 6, 1930, by Mr. Lawrence and Mr. Place]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Certain metal parts of spurs, spur chains, and leather straps, classified as entireties, were assessed with duty at the rate of 50 per centum ad valorem under paragraph 345 of the Tariff Act of 1922. Upon protest, which was limited to the above-named articles in the entry, the United States Customs Court held the same to be dutiable, in their segregable parts, as manufactures of leather under paragraph 1432 and as manufactures of metal under paragraph 399.

The Government has appealed and here contends that the articles consisting of the metal portion of a spur, and a spur chain and the two different kinds of leather straps which accompany same, were entireties and as such fell under the provisions of paragraph 345, Tariff Act of 1922, which reads as follows:

PAR. 345. Saddlery and harness hardware: * * * all articles of iron, steel, brass, composition, or other metal, not plated with gold or silver, commonly or commercially known as saddlery or riding bridle hardware, 50 per centum ad valorem; * * *

The importer protested that the articles were not dutiable as assessed, and undertook to prove commercially that the merchandise was not commonly or commercially known as saddlery or riding-bridle hardware. The importer's testimony was limited to one witness who testified, among other things, that he had sold the instant merchandise in all parts of the country for 20 years and that he had never heard the term "saddlery hardware" or "riding-bridle hardware" referred to; that he sold the imported merchandise at wholesale to Army and Navy officers and Army and Navy uniform dealers; that he did not sell them to branches of the service which have to do with the riding of horses only; that they were used by all branches of the service such as the medical, aviation, and quartermaster corps, and that the Army regulations required the wearing of the instant merchandise by Army officers; that he did not sell saddlery at all and did not sell bridle hardware; that he could not answer the question as to whether the items formed sets and that it was impossible for him to answer the question: "Do you ever sell them [referring to the three exhibits] complete like that?" He later said the items on the invoice did not form sets and that "they were sold together or separately as desired."

The Government produced two witnesses, one of whom, Milton T. Nafey, represented the Stalker Manufacturing Co. which sold saddles, bridles, and "everything that goes with it, hardware."

He testified that his concern manufactured the goods and that they were sold all over the country; that he sold these goods prior to 1922; that in the trade, Exhibits 1, 2, and 3, the merchandise in controversy, were definitely, uniformly, and generally known by a certain trade name and that they were riding spurs and would come under saddlery hardware; that the chains, spurs, and straps are sold together and separately; that some chains only are sold and some straps only are sold; that orders he received did not call for riding-bridle hardware and that if they asked for riding-bridle hardware, he would not know what they meant, and that when they order they specify the articles they want such as "Weymouth bits or Pelham bits or spurs or straps"; that they do not use the term "saddlery hardware" or "riding-bridle hardware" in their business on their invoices, but only in their catalogues; that Exhibits 1, 2, and 3 come within the class known as riding-bridle hardware. On cross-examination the witness was asked how he knew that the meaning in the trade was definite and uniform and he answered: "Well, I suppose I know it from many years being in that line. It is a general understanding." Being asked: "How do you come to that understanding between your customer and yourself when you never use the term?" his answer was: "We do not have to have an understanding about what is saddlery hardware. I know it inside of my mind," and that he did not discuss the question with the customers; that he took it for granted that it was uniform. He testified further that shears, clippers, and sweat scrapers were neither harness hardware nor riding-bridle hardware, but were regarded as saddlery specialities and were listed under that heading in the catalogue of his firm in evidence; that drenching bottles, bit burnishers, saddle soap, mane combs, chamois cloths and other articles represented in the catalogue of his firm were neither harness, saddlery, harness hardware nor riding-bridle hardware. On recross-examination we find the following in the form of questions and answers:

Q. Now, it is definite, so you say. If it is so definite, please tell me just what riding-bridle hardware is, and what saddlery hardware is.—A. Well, saddlery hardware is anything that is connected with leather work in general, what you call saddlery hardware—all items of leather, buckles, and bits and——

Q.. I will give you a little prompting perhaps.—A. No; I will tell you what saddlery hardware is—straps, spurs, and what not; you can get it in the book.

The second witness for the Government, E. Henry Boardman, represented the Smith-Worthington Co., who sold "harness, riding goods, saddlery hardware—everything in horse goods," and testified that he had been in the business for 36 years and was manager of the firm; that he bought some goods but that they manufactured largely; that his concern sold all over the country and that they handled

merchandise like Exhibits 1, 2, and 3; that the merchandise at bar was, prior to 1922, known as saddlery hardware. Upon being asked how he knew that the merchandise was definitely, uniformly, and generally known in the trade prior to 1922 as saddlery hardware, he replied: "I have known it all my life; I have been told it, that is all I know. Everybody in the trade knows it"; that the orders would call for the particular article; that saddlery hardware is a general term that would cover the spurs and lots of other things; that he had heard the term "saddlery hardware" repeated time and time again and he was told about saddlery hardware from the men from whom he learned his business and that he had heard it repeated in the trade a thousand times and more; that if a customer asked for saddlery hardware he would ask him what he wanted; that they did not use the term on invoices; that saddlery is leather goods to equip a horse for riding purposes and that "saddlery contains saddlery hardware"; that a saddletree is saddlery; that many of the things listed in the catalogue of his company, such as harness makers' tools, saddle paste, soaps, brushes, wagon umbrellas, stable forks, etc., were not saddlery, saddlery hardware, or riding-bridle hardware; that he regarded currycombs and clippers, used to clean the horse, as saddlery hardware.

Through the Government's two witnesses above quoted, five catalogues were introduced in evidence as illustrative exhibits, one of the Smith-Worthington Co., two of the Stalker Manufacturing Co., and two of the August Buermann Manufacturing Co. All five catalogues refer to saddlery hardware and, in at least one of each firm, spurs are illustrated which appear to be identical with the merchandise at bar.

In the Stalker Manufacturing Co. catalogue, under "Saddlery Hardware," is listed what seems to be the identical riding spur in issue here. It is listed and illustrated in three separate items: the metal part without the chain, the chain itself (listed as spur chains), and the two straps (listed as spur straps). Under the subhead "Riding Spurs" are listed and illustrated spurs which appear to be identical with the merchandise at bar (with and without rowels).

In the August Buermann Manufacturing Co. catalogue the same spur is listed under the title "New, U. S. Regulation Army Spur (recently adopted by the U. S. Gov't)." Prices are quoted with and without straps but not with the chains. The same spur is listed under "Spurs" in a catalogue partly devoted to "saddlery hardware" as "Polo spurs, no rowel."

The importer also introduced price lists of wholesalers showing the offer of sales of the merchandise involved as separate parts—spurs, spur straps, and spur chains.

The court below laid special emphasis upon that part of the testimony of the witness for the importer which stated that he had dealt in this class of merchandise for 20 years and that he sold throughout the United States to Army and Navy officers and to Army and Navy uniform dealers and that never in his experience was it referred to as saddlery hardware or riding-bridle hardware. After quoting somewhat at length from the testimony of one of the Government witnesses, the court stated that it was unconvincing and further stated that the documentary proof in the form of catalogues was not of "sufficient probative force to establish that the spurs, spur chains, and straps in question were saddlery or riding-bridle hardware."

The first issue which presents itself is, are the three exhibits to be regarded as one article—an entirety? The wording of the leather and metal schedules, the character of the testimony, and the exhibits in this case make this a somewhat difficult question. We do not think *Borgfeldt & Co.* v. *United States*, 11 Ct. Cust. Appls. 105, T. D. 38750, is in point. The metal portion of the spur is not a complete or usable article without the leather strap which goes around the foot and, as we understand it, the metal portion of the spur could not be worn without it. Exhibit 2, the chain, and the larger leather strap of Exhibit 3 are both used for the same purpose, to go under the foot and serve the purpose of holding the spur down on the heel. The metal spur portion could not be worn without some kind of article to serve the purpose performed by the strap or the chain.

In *United States* v. *Kalter Merchantile Co. et al.*, 11 Ct. Cust. Appls. 540, T. D. 39680, this court had under consideration rubber boots fitted with rubber loops by means of which leather straps, imported with them, might be used to bind them to the feet and ankles. The evidence showed that the boots could be and were used without the straps. This court held that the boots and straps did not constitute an entirety for the reason that without the straps the boots remained boots and the straps remained straps, and that the use of one was not indispensable to the use of the other and said:

We are of the opinion that even though it be considered that the boots and the straps were designed to be used together, when desired, and were sold together by the importers, yet, when used together, each retains its identity, name, and character; each is a separate entity; and when attached, each performs its separate function without loss of any of its essential characteristics. The boot remains a boot and the leather strap remains a leather strap. When separated the boot remains useful as a boot. It retains its commercial entity and remains complete in itself, a rubber boot. The leather strap also retains its essential character and commercial entity, and remains complete in itself, a leather strap, or, as has been suggested, a leather belt.

A number of cases in point are cited therein and discussed and we think the reasoning of that case is decisive of the issue at bar, and that the exhibits in controversy here constitute an entirety.

It is also interesting and we think appropriate to note that in paragraph 1606 (free list) of the Tariff Act of 1922, Congress provided for "Leather: * * * harness, saddles, and saddlery, in sets or parts, *except metal parts*," (italics ours) while in the paragraph in controversy, the articles provided for are in the metal schedule, and must be of metal and the paragraph *does not make an exception of leather parts.*

As to whether or not the importation is saddlery hardware or riding-bridle hardware, it must first be borne in mind that the collector so assessed it. To sustain its protest that it was not saddlery hardware or riding-bridle hardware, the importer undertook to prove that commercially it was not so known. It attempted to prove it by only one witness, who had dealt only with the Army and Navy trade and the Army and Navy uniform dealers. His testimony went only to the effect that he had never heard the terms "saddlery hardware" and "riding bridle hardware" used. The testimony, if given all the weight claimed for it, would only tend to show that the understanding in trade and commerce claimed by the Government was not general and uniform. If the entire Army and Navy trade which dealt in this particular article had no knowledge of the term, it hardly could be said that the term was known generally and uniformly throughout the United States. The testimony of the two witnesses for the Government, when considered with the catalogues and other documentary evidence, in our judgment thoroughly rebuts any testimony offered by the importer and establishes that in the same trade, where importer's witness dealt, the merchandise at bar was uniformly, generally, and definitely known as "saddlery hardware." The collector's classification carries with it the presumption that the goods were either commonly or commercially known throughout the United States as "saddlery or riding-bridle hardware." There was no attempt to prove that they were not so known in any trade except the Army and Navy trade referred to.

It might be observed in passing that it seems strange that this witness, who for 20 years had sold this kind of goods, had never heard "saddlery hardware" or "riding-bridle hardware" referred to, in view of the documentary evidence introduced. He may have distinguished between seeing the term in print and hearing it spoken.

There is nothing in this record which convinces us that Congress did not have such merchandise as that at bar in mind when it enacted the paragraph in controversy. On the contrary the context of the paragraph and predecessor paragraphs and other circumstances indi-

cate to us that the term "commonly or commercially known as saddlery or riding bridle hardware" was used advisedly for the purpose of including therein merchandise like that at bar.

In *Wyman* v. *United States*, 13 Ct. Cust. Appls. 241, T. D. 41198, the court was passing on the dutiable status of stirrup leathers, reins, halters, girths, and other leather articles and was considering saddlery only when applied to the leather schedule and the definition of saddlery as therein found has little, if any, bearing on the issue at bar.

When Congress enacted the paragraph in controversy it had before it "General Tariff Revision Hearings, Committee on Ways and Means," 1920–21, Part II, page 1124, which shows that the committee's attention was directed to the fact that saddlery hardware was coming in free of duty under paragraph 530 of the Tariff Act of 1913, and that the same merchandise under the act of 1909 was dutiable at 35 per centum ad valorem. The recommendation made to the committee was in the following language:

1. Saddlery hardware, harness hardware, hardware in general for use in connection with horse, mule, and draft-animal equipment, buckles, and strap hardware of all kinds, made wholly or in chief value of iron or steel, brass, or composition, finished or unfinished, 100 per cent ad valorem (p. 1124).

The reasons for the recommendation as given were in part as follows:

1. On account of the wide difference in cost between foreign and domestic labor and material, competition coming principally from Great Britain, France, and Germany.

2. The present importance of these industries which embrace from 50 to 60 concerns furnishing employment for about 35,000 persons. These industries provide the hardware necessary to equip the 21,109,000 horses and mules, which, according to the Government census, existed on the farms of the United States on January 1, 1920, as well as the large number used in the cities.

At page 454 of the Summary of Tariff Information, 1921, under the heading "Saddlery and Harness Hardware," we find the following:

*Description and uses.*—The phrase "saddlery and harness hardware" is applied to buckles, rings, etc., made of metal and used on bridles, saddles, and harness * * *.

It will be observed there that bridles are included under the term "saddlery and harness hardware." Congress, when it acted, provided for "saddlery and harness hardware * * *; all articles of iron, steel, brass, composition, or other metal, not plated with gold or silver, commonly or commercially known as saddlery or riding bridle hardware."

In Knight's American Mechanical Dictionary, Vol. 3, pages 2011–2012, under the term "Saddlery and Harness," we find listed the word "spurs:"

In the Encyclopædia Britannica, 14th edition, Vol. 19, page 804, under "Saddlery and Harness," we find the following: "Saddlers' ironmongery embraces the making of buckles, rings, chains, stirrups, *spurs*, bits, hames." (Italics ours.) This would have a tendency to indicate that spurs are embraced within the term "saddlery."

While all these extrinsic facts and dictionary definitions might not be sufficiently pertinent to be controlling in the premises, they certainly point to a conclusion in harmony with the collector's classification.

The judgment of the United States Customs Court is *reversed.*